869 A.2d 410

**Christopher CORONEOS, et al.**

v.

**MONTGOMERY COUNTY, Maryland.**

**No. 265, Sept. Term, 2004.**

Court of Special Appeals of Maryland.

March 1, 2005.

**412**

Joseph D. Gallagher, Rockville, MD, for appellant.

Charles W. Thompson, Jr. (Sharon V. Burrell, Patricia P. Via, on brief), Rockville, for appellee.

Panel MURPHY, C.J., EYLER, DEBORAH S., MEREDITH, JJ.

EYLER, DEBORAH S., J.

The Circuit Court for Montgomery County granted summary judgment in favor of Montgomery County and the Animal Services Division of the Montgomery County Police Department ("ASD"), the appellees, in a suit brought by Christopher Coroneos and his company, Reptile Connection, Inc. ("Reptile"), the appellants. The appellants pose four questions for our review, which can be reduced to one:[1]

Did the court err in granting summary judgment?

For the reasons set forth below, we shall reverse the judgment of the circuit court and remand the case for further proceedings.

## FACTS AND PROCEEDINGS

On May 24, 2003, ASD received a complaint about an "offensive odor" emanating from a warehouse at 2629 Garfield Street, in Silver Spring. Code Enforcement Officer Diana

---

1. The questions as presented by the appellants are:
   I. Whether the Montgomery County Code requires the owner of impounded animals to prepay their estimated cost of care (or post a bond) as a condition to a hearing on the propriety of the impoundment.
   II. Whether, in the event that prepayment of the estimated cost of care (or the posting of a bond) is required under the Montgomery County Code, the owner of the animals is entitled to a hearing on the reasonableness of the estimated cost of care or on an application for waiver of the prepayment requirement.
   III. Whether Plaintiffs were deprived of their property without due process of law in violation of the Fourteenth Amendment to the United States Constitution and Article 24 of the Maryland Declaration of Rights when Montgomery County deemed the animals forfeited without a hearing.
   IV. Whether Montgomery County is entitled to governmental immunity in an action brought under 42 U.S.C. § 1983 based on the forfeiture of property without due process of law.

Clement went to the warehouse and found a dead snake and a dead gecko in the parking lot. She also retrieved 16 snakes from two adjacent warehouses. An employee at one of those warehouses told Clement she had found an empty shipping crate marked "Venomous Snakes" in the parking lot.

Five days later, the landlord of the 2629 Garfield Street warehouse, a Mr. Zanoff,[2] called ASD to complain about "unsanitary or dangerous conditions due to inadequate facilities" for the number of animals in the warehouse. He identified Coroneos as the leascholder and reported that a sign on the warehouse read "Reptile Connection." According to Zanoff, Coroneos did not have proof of a use and occupancy permit, which was required to operate the leased space as a business. Paul Hibler, Deputy Director of ASD, went to the warehouse in response to Zanoff's complaint and found a dead scorpion on the parking lot.

On June 3, 2003, Clement obtained a warrant to search the warehouse and seize any animals in the warehouse for violations of Montgomery County Code ("MCC") sections 5–201(a) (cruelty to animals); 5–203(a)(3) (animal trespass to property); 5–203(a)(5) (unsanitary or dangerous conditions for animals); and 5–202(a)(1)(B) (dangerous animals). ASD officers executed the search warrant the next day. Inside the warehouse, they found "animals in need of veterinary care, escaped snakes, over 1500 animals[,] some not alive, including venomous snakes and lizards." Many of the animals existed under the following conditions:

> unsecured in proper containers for species . . . uncontained . . . [without] food supplies for [the] species housed . . . decomposing carcasses housed with living animals . . . odor of dead animals and rotten vegetation . . . lack of proper heat and light for species maintained . . . decomposing feeder animals housed with animals too ill to consume food . . . housed without access to water.

---

**2.** The record does not include Mr. Zanoff's first name.

A veterinarian on the scene determined that many of the animals were in need of "immediate vet[erinary] care including hospitalization and intensive care."

The ASD officers declared the live animals "at risk" and "in need of protection" and began removing them. As they were doing so, Coroneos arrived at the scene.[3] He could not provide any records to show the name of a veterinarian who had examined or would examine the animals, any inventory or estimated number of animals inside the warehouse, or copies of any state or federal permits for keeping the animals at the warehouse. In addition to seizing the "at risk" live animals, ASD officers seized computers and documents located in the warehouse.

The next day, June 5, ASD officers arranged for various caregivers and veterinarians to inventory the animals, assess their conditions, and provide care for them. On June 7, ASD informed Coroneos that he had a right to appeal the seizure of his animals, under MCC section 5–306(a), as being arbitrary, illegal, or not based on substantial evidence, but that, under MCC section 5–303(c), he was responsible for paying the costs of boarding and caring for the animals pending an appeal.[4]

On June 9, Coroneos filed a *pro se* appeal with the Montgomery County Animal Matters Hearing Board ("Board"). He wrote on the appeal form: "This is an appeal of the confiscation of my reptiles, one bird[,][ ] some invertebrate[s,] my computer, paperwork, and miscellaneous documents."[5]

---

**3.** Coroneos was carrying approximately 2000 additional reptiles. The ASD officers subsequently declared those animals to be in good health and did not seize them.

**4.** There is no documentation in the record about the steps ASD took on June 5 to arrange care for the animals or the information ASD asserts it communicated to Coroneos on June 7.

**5.** Also on June 9, 2003, Coroneos was charged in the District Court of Maryland for Montgomery County with 31 counts of misdemeanor animal cruelty, under Maryland Code (2002), section 10–604(a)(4)(ii) of the Criminal Law Article ("CL"), for failure to provide the animals in question "nutritious food in sufficient quantity, necessary veterinary care; proper drink, air, space, shelter, or protection" while they were

On June 12, Coroneos and Reptile retained Maria Vacchio, Esquire, to represent them. The next day, Vacchio wrote to Captain Wayne M. Jerman, the Director of ASD. She requested, on behalf of her clients, a waiver of payment for the care of the animals, under MCC section 5–303(c)(7), asserting that the payment requirement would create a "serious financial hardship" for Coroneos because the confiscated animals were his livelihood, and that ASD's estimate of the cost of care for the animals was "far beyond what the actual cost of care would be."[6]

On June 16, 2003, Director Jerman wrote to Coroneos directly, saying that he had five days to appeal the impoundment of his animals (even though an appeal had been filed); that he had to prepay the estimated cost of care for the animals during their impoundment; and, if he did not, the animals would be deemed abandoned and would become the property of Montgomery County, under MCC section 5–303(c)(5). The letter attached an itemized list of the fees for caring for the animals, which came to $45,390 per month. The letter did not address the waiver request.

On June 17, 2003, Hibler wrote to Vacchio, acknowledging receipt of the waiver request and stating that it needed to be supported by documents, including the most current Internal Revenue Service filings for both business and personal income, showing that prepayment would "cause a significant financial hardship." On June 20, 2003, Vacchio responded by letter, enclosing Coroneos's 2001 federal and state income tax returns, which showed a gross annual income of $47,722. She explained that the returns were "all of the documentation now available" to Coroneos, as ASD had confiscated his "personal and business papers" when it seized the animals on June 4, 2003. She asked for copies of "any documents you may have

in his "charge or custody." Coroneos later was charged by indictment in the Circuit Court for Montgomery County with seven counts of felony animal cruelty.

**6.** It is unclear from the record how or whether an estimated cost of care had been communicated to Coroneos and/or Vacchio at that time.

that evidence costs claimed by [ASD] with regard to [Coroneos's] animals."

On June 24, 2003, Hibler wrote to Vacchio stating that Director Jerman had denied Coroneos's waiver request, based on a "review of the documents, as well as ... [Coroneos's] assets[,]" and that, if Coroneos wished to pursue an appeal of ASD's seizure of the animals, he would have to pay the $45,390 monthly care charge by noon on June 27, 2003, or be deemed to have abandoned the animals.

On June 26, 2003, Vacchio wrote to Director Jerman, noting that some of the seized animals were property of the corporation; that, because ASD had seized Coroneos's computer and other records, he could not submit any information about the financial status of the corporation on the waiver form; and that "the issue of prepayment of costs cannot be fully explored" without the corporation's information. Vacchio also stated that because Coroneos could not afford the prepayment amount, he wanted to relinquish some of the animals to buyers, and was asking ASD to return the animals for which he had buyers. Vacchio asked for a hearing "on the issue of prepayment of costs."

Also on June 26, 2003, Vacchio filed an appeal on Coroneos's behalf with the Board of the decisions to seize the animals and other materials from the warehouse and to deny his application for a waiver of prepayment costs. She asked for a hearing on both issues.[7]

There was no response to Vacchio's June 26 letter. On July 7, 2003, Vacchio spoke by telephone to Michael Fry, an Assistant County Attorney in the Office of the Montgomery County Attorney, proposing a settlement that would enable Coroneos to "reclaim his reptiles and assure the county that the conditions at his place of business are acceptable." Under the proposal, which Vacchio put in writing that day, all the non-venomous reptiles and other animals would be returned to

---

7. On June 26, 2003, Vacchio amended the appeal to add the corporation.

Coroneos, except the "baby ball pythons"; ASD could inspect his place of business at any time during normal business hours; and he would provide veterinary certification that the animals were being properly cared for. Vacchio urged the County to agree to the settlement proposal, emphasizing that the animals constituted Coroneos's "livelihood" and "he [could] not afford the expenses" being charged by the County for the animals' care, which "far surpasse[d] the actual cost of car[e]."

On July 11, Fry responded to Vacchio's July 7 letter. He rejected the settlement proposal and said that, if Coroneos still wanted to appeal ASD's decision to impound the animals, he would have to pay the full amount of $45,390 by July 17, which would be the "last extension," or petition the Board to post a bond to pay these expenses in the event that Coroneos did not prevail in his appeal. If Coroneos did not do one or the other, ASD would consider his animals to be abandoned under 5–306(c)(5) and would "commence action to dispose of the animals."

Vacchio contacted ASD officials and on July 16 was told that a bond in the amount of $300,000 could be posted in lieu of the payment of $45,390. Vacchio requested additional time for Coroneos to secure resources for the bond, but this request was rejected.

On July 18, 2003, in the Circuit Court for Montgomery County, the appellants initiated the case at bar by filing a "COMPLAINT FOR DECLARATORY JUDGMENT, IN-JUNCTION AND DAMAGES." They alleged the County had violated their due process rights under the Fourteenth Amendment to the United States Constitution and Article 24 of the Maryland Declaration of Rights. Specifically, they asserted:

[The appellees] have deprived [the appellants] of their liberty and property interests without due process of law by: (1) seizing all of [Coroneos's] stock in trade and records, rendering it impossible for him to do business or to prove that payment of $45,390 per month is a hardship; (2) by demanding payment of $45,390 when there is no cost being

incurred by [the appellees] for the care of the animals; (3) by refusing to return the livestock to [the appellants] without a hearing, determining that there are no conditions for their return and that they will not be returned; (4) by threatening [the appellants] with abandonment of the animals if the money is not paid or bond is not posted; (5) by depriving [the appellants] of their livelihood; (6) by providing [the appellants] with no meaningful opportunity to comply with [the appellee's] demand for bond; (7) by refusing to schedule [the appellants'] appeal until payment of $45,390; and (8) by predetermining, without a hearing, that the livestock will never be returned.

As relief, the appellants asked the court to enjoin the County from charging them for the care of the animals without proof of the costs and from treating the animals as abandoned; to require the County to set "reasonable conditions" for the return of the animals, to schedule an immediate hearing on the appellants' appeals to the Board, and to determine the appropriate conditions for the return of the animals; to order the County to pay costs and attorneys' fees; and to grant any other relief. Notwithstanding the title of their complaint, they did not ask for damages.

Together with the complaint, the appellants filed a motion for an "immediate injunction enjoining [the County] from treating the confiscated livestock as abandoned." The court denied the motion the same day, "upon representation that [the] County has no intention of destroying [the] animals or placing them for permanent adoption."

On August 12, 2003, Vacchio wrote to J.C. Crist, the Board Chairman, complaining that she had not yet been advised of the hearing date for the June 9 and June 26 appeals. Crist forwarded the letter to the County Attorney's Office. On August 20, 2003, Fry wrote to Vacchio, stating that "no appeals [were] pending" and "[n]o hearing w[ould] be scheduled" because Coroneos had waived his right to appeal by not "paying the required boarding fees, posting a bond, or making suitable arrangements on his own, after having been given

extraordinary time and latitude to do so." In fact, consistent with Fry's representations, the Board never took any action with respect to the appeals, in effect treating them as if they did not exist.

In the instant case, the County filed an answer to the complaint and discovery ensued. Vacchio struck her appearance and was replaced by new counsel for the appellants.[8]

On March 3, 2004, the appellees filed a motion for summary judgment, a supporting memorandum of law, and exhibits. They argued that the court lacked subject matter jurisdiction because the appellants had not exhausted their administrative remedies; and that the appellants had waived their right to appeal to the Board the propriety of ASD's seizure of the animals by not prepaying the cost of care, and thereby abandoning the animals.[9] The County requested a hearing.

The appellants filed a timely opposition to the motion for summary judgment, with exhibits in support. Principally, they argued that, under a proper interpretation of MCC section 5–306(c), they were not required to prepay the cost of care of the animals in order to pursue an appeal of a decision of the ASD Director to the Board and that, by conditioning their appeals on prepayment, the appellees denied them access to the administrative process they were due. They argued that they did not fail to exhaust their administrative remedies; notwithstanding their efforts to engage in the administrative process, it was denied them.[10]

---

**8.** On February 4, 2004, Coroneos entered a plea of guilty, in the Circuit Court for Montgomery County, to two counts of "abuse or neglect of animals" and one count of transporting a handgun in a vehicle. He was sentenced to eighteen months in jail, with all but thirty days suspended, and eighteen months probation upon release.

**9.** The appellees also argued that the claims asserted were barred by governmental immunity.

**10.** The appellants also argued that the appellees were not immune from suit because the appellants were pursuing the action under 42 U.S.C. section 1983 and the appellees acted pursuant to an established govern-

On March 29, 2004, the court held a hearing on the summary judgment motion. The court ruled from the bench, granting summary judgment in favor of the appellees on the ground that the appellants had waived their right to the process they were due-an appeal of the Director's decisions to the Board-by not making the prepayment, posting a bond, or securing alternative arrangements for the care of the animals. Specifically, the court determined that MCC sections 5–303 and 5–306, read together, made prepayment, posting a bond, or securing alternative care a precondition to an appeal to the Board and the appellants "lost that right to appeal" when they failed to satisfy one of those three conditions.

On the same day, the court memorialized its ruling in an order granting summary judgment for the appellees. The order was entered on March 30, 2004.

The appellants noted a timely appeal to this Court.[11]

## STANDARD OF REVIEW

■ A circuit court may grant summary judgment upon a finding that there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Md. Rule 2–501; *Salamon v. Progressive Classic Ins. Co.*, 379 Md. 301, 307, 841 A.2d 858 (2004); *Smith v. City of Baltimore*, 156 Md.App. 377, 382, 846 A.2d 1121 (2004). The court's decision on both issues is a legal ruling; accordingly, we review a circuit court's decision to grant summary judgment *de novo*. *O'Connor v. Baltimore Co.*, 382 Md. 102, 110, 854 A.2d 1191 (2004); *Hines v. French*, 157 Md.App. 536, 549–50, 852 A.2d 1047 (2004).

■ If the moving party offers more than one basis for granting summary judgment, and the trial court rules on only one basis, we ordinarily are confined to review the ruling on

ment policy when they classified the animals as abandoned and asserted ownership over them.

11. A motion to stay judgment was denied.

the basis on which the court granted summary judgment. *Lovelace v. Anderson,* 366 Md. 690, 695, 785 A.2d 726 (2001); *Hoon v. Lightolier,* 158 Md.App. 648, 657, 857 A.2d 1184 (2004). We only will review an issue that *did not* form the basis for the court's ruling when the court would have had no discretion but to grant summary judgment on that alternative basis. Md. Rule 8–131(a); *Blades v. Woods,* 338 Md. 475, 478, 659 A.2d 872 (1995); *Middlebrook Tech, LLC v. Moore,* 157 Md.App. 40, 58, 849 A.2d 63 (2004).

## DISCUSSION

■ The appellants contend the circuit court's determination that prepayment of the cost of care of the animals (or a bond or alternative arrangement) was a condition to perfecting an appeal of a decision of the ASD Director to the Board was legally incorrect. They argue that the plain language of MCC section 5–306(c) only requires prepayment of the cost of care in an appeal taken from orders issued or affirmed *by* the Board, and not in an appeal from a decision of the ASD Director *to* the Board.

The County responds that MCC section 5–306(c) must be read in the context of MCC section 5–303(c)(1), which provides that an owner must prepay the costs of care "beginning on the date the animal was impounded," and, when so read, means that prepayment must be made in order to appeal a decision of the ASD Director to the Board.

The primary goal of statutory interpretation is to discern and effectuate the legislature's intent. *Stern v. Board of Regents, Univ. Sys. of Md.,* 380 Md. 691, 720, 846 A.2d 996 (2004); *McCormack v. Board of Educ. of Baltimore Co.,* 158 Md.App. 292, 304, 857 A.2d 159 (2004). The plain language of the statute always is the starting point in that endeavor. *Motor Vehicle Admin. v. Jones,* 380 Md. 164, 175, 844 A.2d 388 (2004); *Holbrook v. State,* 364 Md. 354, 364, 772 A.2d 1240 (2001). We must give the words of a statute their common and everyday meaning. *Collins v. State,* 383 Md. 684, 688–89, 861 A.2d 727 (2004); *Pak v. Hoang,* 378 Md. 315, 323, 835 A.2d

1185 (2003). In doing so, we will read the words in the context of the statutory scheme they are a part of. *Morris v. Prince George's Co.,* 319 Md. 597, 604, 573 A.2d 1346 (1990); *Chilcoat v. State,* 155 Md.App. 394, 405, 843 A.2d 240 (2004). If, given its common and everyday meaning, the language is clear and unambiguous, we will not look beyond the words to determine legislative intent. *Nesbit v. Govt. Employees Ins. Co.,* 382 Md. 65, 73, 854 A.2d 879 (2004); *Moore v. Miley,* 372 Md. 663, 677, 814 A.2d 557 (2003). In such an instance, "we simply apply the statute as it reads." *Mohan v. Norris,* 158 Md.App. 45, 57, 854 A.2d 259 (2004) (citing *Derry v. State,* 358 Md. 325, 335, 748 A.2d 478 (2000)). We may "neither add nor delete language so as to reflect an intent not evidenced in the plain and unambiguous language of the statute." *Price v. State,* 378 Md. 378, 387, 835 A.2d 1221 (2003); *Mohan, supra,* 158 Md.App. at 57, 854 A.2d 259.

If a statutory term or provision is ambiguous, however, we must apply additional principles of statutory interpretation to glean the meaning of the statute. *Price, supra,* 378 Md. at 387, 835 A.2d 1221; *Allstate Ins. Co. v. Kim,* 376 Md. 276, 290, 829 A.2d 611 (2003); *Heartwood 88, Inc. v. Montgomery Co.,* 156 Md.App. 333, 359, 846 A.2d 1096 (2004). We will interpret the provision in the context of the statutory scheme. *Selig v. State Highway Admin.,* 383 Md. 655, 681, 861 A.2d 710 (2004); *Gordon Family Partnership v. Gar on Jer,* 348 Md. 129, 138, 702 A.2d 753 (1997). Furthermore, we will consider the purpose and objective of the legislature's enactment. *Deville v. State,* 383 Md. 217, 223, 858 A.2d 484 (2004); *Gleneagles, Inc. v. Hanks,* 156 Md.App. 543, 553, 847 A.2d 520 (2004). In any event, we must avoid statutory constructions that are "illogical, unreasonable, or inconsistent with common sense." *Bd. of Physician Quality Assur. v. Mullan,* 381 Md. 157, 168, 848 A.2d 642 (2004); *Bank of Am. v. Stine,* 379 Md. 76, 86, 839 A.2d 727 (2003).

Statutory interpretation is a legal decision. *Salamon, supra,* 379 Md. at 307, 841 A.2d 858; *McKay v. Dept. of Pub.*

*Safety,* 150 Md.App. 182, 193, 819 A.2d 1088 (2003). Accordingly, on appellate review, we consider the issue *de novo.*

MCC section 5–303, entitled "Impoundment," provides:

(a) *Generally.* The Director, an animal control officer, or the Board may enforce an animal control law or protect the health or safety of a person, an animal, or the public by impounding ... an animal at an animal shelter or other facility approved by the Director.

(b) *Notice of impoundment.* The Director must ... notify the owner of an impounded animal. The notice must inform the owner of applicable requirements of this Chapter, including the requirement in subsection (c) to pay in advance for the animal's care and the opportunity to request a waiver of the prepayment requirement under subsection (c)(7)....

(c) *Prepayment for care.*

(1) Within 3 days after receiving notice that an animal was impounded under any provision of this Chapter, the animal's owner must pay to the County the estimated cost of caring for the animal for the 30–day period beginning on the date the animal was impounded. The Director must estimate the cost, which must include the cost of food, veterinary care, and other necessities that a responsible owner would provide for the animals....

. . . . .

(7) The Director may waive or modify the prepayment required under this subsection ... if the owner provides evidence that prepayment for 30 days of care would be a serious financial hardship to the owner.

MCC section 5–306, entitled "Appeal," provides:

(a) *Appeal to the Board.* A person aggrieved by a decision of the Director or an animal control officer may appeal the decision to the Board within 5 days after the Director or the animal control officer notifies the owner about the decision. The Board may modify a decision of the Director or an animal control officer only if the

appellant proves by a preponderance of the evidence that decision was arbitrary, illegal, or not based on substantial evidence. The Board must issue a written decision explaining the factual and legal basis for the decision.

(b) *Appeal from the Board.* A person aggrieved by an order of the Board may appeal the order under Section 2A–11 within 10 days after the Board issues the order.

(c) *Requirements for appeal.* If an owner appeals an impoundment, seizure, or disposition order issued or affirmed by the Board, the owner must board the animal at a facility approved by the Division. The owner must pay the cost of impounding the animal before and during the appeal, or if the Board allows, post a bond to pay these expenses if the owner does not prevail on appeal. If the owner fails to meet these requirements, the animal is abandoned.

The language of subsection (c) of MCC section 5–306 is plain and unambiguous. It requires payment of the cost of impoundment, which includes cost of care, or the posting of a bond, if allowed by the Board, "before and during" an appeal from an "impoundment, seizure, or disposition order *issued or affirmed by the Board* [.]" (Emphasis added.) By its express language, the subsection applies to appeals taken *from orders by the Board.* The subsection makes no reference whatsoever to appeals *from decisions by the Director* to the Board. Contrary to the basic tenets of statutory construction, the appellees would have us read into subsection (c) language imposing a prepayment requirement for an appeal from a decision by the Director to the Board. We decline to do so.

On its face, subsection (c) of MCC section 5–306 only requires prepayment by an owner to pursue an appeal *from a Board* order, not to pursue an appeal to the Board, *from a decision of the Director.* It is not necessary to analyze MCC section 5–303 to determine the meaning of MCC section 5–306(c).

We note, however, that reading those sections in concert does not lend support to the appellees' assertion that prepayment of impoundment costs, posting a bond, or making arrangements for care is a prerequisite to an appeal to the Board from a decision of the Director. If that were the case, the statutory right under MCC section 5–306(a) to appeal a decision by the Director to deny a waiver of prepayment costs, on the ground that the decision was arbitrary, illegal, or not based on substantial evidence, would be meaningless, because the owner would have to make the very payment he is attempting to challenge as a prerequisite to the appeal. When read in harmony with MCC section 5–306, MCC section 5–303(c)(1) imposes liability on an animal owner for the estimated costs of care, to be prepaid, but does not make prepayment a prerequisite to appeal to the Board a decision of the Director.

The appeals taken by the appellants in June 2003 were from decisions by the Director, to the Board. The appellants were not required, by MCC section 5–306(c), to prepay the cost of care (or post a bond, or arrange adequate care) as a condition to pursuing their appeals. Accordingly, the circuit court erred in ruling that, by not satisfying that condition, the appellants waived their right of appeal under MCC section 5–306. Because that was the sole basis for the court's entry of summary judgment, we shall reverse the decision and remand the case for further proceedings.

The appellees raised numerous arguments in the motion for summary judgment that were not the basis for the circuit court's ruling and do not appear to be such as would compel judgment in favor of the appellees (nor do they so argue). In addition, in their brief, the appellees make legal arguments that were not made in their summary judgment motion (for example, that the appellants did not have a "property interest" in the seized animals because they did not have permits to possess the animals). We express no view on these issues and this opinion should not be read otherwise.

In addition, during oral argument, in response to questions from the Court, counsel for the parties stated that the animals ultimately were disposed of and are no longer in the possession of the appellees. Furthermore, counsel for the appellants stated that the primary relief the appellants sought in the circuit court action was an order requiring the Board to hear and decide the administrative appeals they attempted to pursue in the summer of 2003. As noted, there is no prayer for damages in the appellants' complaint. Thus, it is not clear at this point what the appellants are seeking and whether the relief they are seeking no longer can be given, so that their claims are moot. We suggest that this issue be explored on remand.

Finally, because it is argued in the briefs as being jurisdictional, we shall briefly comment on the issue of exhaustion of administrative remedies. The appellees maintain (as an alternative argument) that the circuit court lacked subject matter jurisdiction over this case because the appellants failed to exhaust their administrative remedies, under MCC section 5–306. Lack of subject matter jurisdiction can be raised at any time. *County Council of Prince George's Co. v. Dutcher,* 365 Md. 399, 405 n. 4, 780 A.2d 1137 (2001); *Lewis v. Murshid,* 147 Md.App. 199, 202–03, 807 A.2d 1170 (2002).

Because the underlying purpose of the doctrine of exhaustion of administrative remedies is to advance a policy of judicial restraint, the issue sometimes is treated as a jurisdictional one; but it is not ordinarily a limitation on the subject matter jurisdiction of the circuit court. *Md.-Nat'l Cap. Park & Planning Commission v. Crawford,* 307 Md. 1, 13–14 n. 4, 511 A.2d 1079 (1986). Also, the doctrine "only comes into play when a litigant attempts to invoke the original jurisdiction of a circuit court to adjudicate a claim based on a statutory violation for which the legislature has provided an administrative remedy." *Med. Mut. Liab. Ins. Soc. of Md. v. B. Dixon Evander & Assoc., Inc.,* 92 Md.App. 551, 563, 609 A.2d 353 (1992) (emphasis omitted). As pertinent here, one of the exceptions to the doctrine is when an agency requires a party

to follow, in a manner and to a degree that is significant, an unauthorized procedure. *Prince George's Co. v. Blumberg,* 288 Md. 275, 285, 418 A.2d 1155 (1980); *Magan v. Med. Mut. Liab. Ins. Soc. of Md.,* 81 Md.App. 301, 306, 567 A.2d 503 (1989).

The circuit court was not without subject matter jurisdiction in this case. The policy of judicial restraint was not implicated. The appellants attempted to pursue their administrative remedy, and resorted to the circuit court only after the agency did not take any action and treated their case as if they had no administrative remedy available. Furthermore, the County informed the appellants on behalf of the Board that, to take administrative action, they would have to make a payment that in fact was not required by law to be made.

**JUDGMENT REVERSED. CASE REMANDED TO THE CIRCUIT COURT FOR MONTGOMERY COUNTY FOR FURTHER PROCEEDINGS. COSTS TO BE PAID BY THE APPELLEES.**