875 A.2d 200

**Carl F. OLTMAN, Sr.**

**v.**

**MARYLAND STATE BOARD OF PHYSICIANS.**

**No. 97, Sept. Term, 2004.**

Court of Special Appeals of Maryland.

June 2, 2005.

458

William M. Ferris, Annapolis, for Appellant.

Thomas W. Keech (J. Joseph Curran, Jr., Atty. Gen., on the brief), Baltimore, for Appellee.

Panel: DAVIS, HOLLANDER and DEBORAH S. EYLER, JJ.

HOLLANDER, Judge.

Carl F. Oltman, Sr., appellant, challenges a determination by the Board of Physicians (the "Board"), appellee, revoking Oltman's physician assistant certificate.[1] The revocation followed appellant's plea of guilty in federal court to "forging or altering a prescription." Appellant's conduct enabled him to obtain prescriptions of Ritalin for his son, knowing that his son was no longer covered under appellant's medical insurance. Oltman sought review of the Board's decision in the Circuit Court for Anne Arundel County, which affirmed.

On appeal, Oltman presents three questions for our review, which require us to consider the Maryland Medical Practice Act, Title 14 of the Health Occupations Article of the Maryland Code, and the Maryland Physician Assistants Act, found in Title 15 of the Health Occupations Article. He asks:

I. On the evidence adduced before the agency in this case, was Appellant convicted of a crime involving moral turpitude within the meaning of that term in §§ 14–404(b) and 15–314 of the Health Occupations Article of the Annotated Code of Maryland?

II. Did the Appellee Maryland State Board of Physicians and the Administrative Law Judge in this matter combine to deprive Appellant of reasonable and fair consideration whether his conviction in the United States District Court for the District of Maryland warranted a sanction less than revocation of his Certificate as a Physician Assistant?

III. Was the denial of a Case Resolution Conference to Appellant by the Maryland State Board of Physicians in this matter an abuse of discretion by the Board?

For the reasons set forth below, we shall affirm.

---

1. When the proceedings began, the Board was known as the Board of Physician Quality Assurance. *See* Maryland Code (2000 Repl. Vol., 2004 Supp.), § 14–201 of the Health Occupations Article (substituting "Board of Physicians" for "Board of Physician Quality Assurance").

## THE STATUTORY SCHEME

Before reviewing the facts, it is important to understand the relevant statutory and regulatory provisions. In Maryland, physicians are governed by Title 14 of the Health Occupations Article ("H.O.") of the Maryland Code (2000 Repl. Vol.), while physician assistants are governed by Title 15 of the Health Occupations Article. In addition, applicable regulations are found in the Code of Maryland Regulations ("COMAR"). The State Government Article ("S.G.") of the Maryland Code (1984, 1999 Repl. Vol., 2003 Supp.) is also pertinent.

H.O. § 15–314 provides:

**§ 15–314. Grounds for reprimands, suspension or revocation of certificate.**

Subject to the hearing provisions of § 15–315 of this subtitle, the Board, on the affirmative vote of a majority of its members then serving, may reprimand any certificate holder or suspend or revoke a certificate if the certificate holder:

\* \* \*

(3) Violates any provision of this title or any regulations adopted under this title or commits any act which could serve as the basis for disciplinary action against a physician under § 14–404 of this article

H.O. § 15–315(a) is also relevant. It provides, in part:

**§ 15–315. Same—Hearings.**

(a) *Opportunity for hearing.*—(1) Except as otherwise provided under § 10–226 of the State Government Article, before the Board takes any action under § 15–314 of this subtitle, the Board shall give the individual against whom the action is contemplated an opportunity for a hearing before a hearing officer.

(2) The hearing officer shall give notice and hold the hearing in accordance with Title 10, Subtitle 2 of the State Government Article.

\* \* \*

(b) *Appeals.*—(1) Any certificate holder who is aggrieved by a final decision of the Board under this subtitle may not appeal to the Board of Review but may take a direct judicial appeal.

(2) The appeal shall be as provided for judicial review of the final decision in Title 10, Subtitle 2 of the State Government Article. . . . [2]

S.G. § 10–226(c) provides:

### § 10–226. Licenses—Special provisions.

\* \* \*

(c) *Revocation o[r] suspension.*—(1) Except as provided in paragraph (2) of this subsection, a unit may not revoke or suspend a license unless the unit first gives the licensee:

(i) written notice of the facts that warrant suspension or revocation; and

(ii) an opportunity to be heard.

As we have seen, H.O. § 15–314 expressly refers to H.O. § 14–404. Title 14 of the Health Occupations Article is captioned "Physicians." H.O. § 14–404(b) provides:

### § 14–404. Denials, reprimands, probations, suspensions, and revocations—Grounds.

\* \* \*

(b) *Crimes involving moral turpitude.*—(1) On the filing of certified docket entries with the Board by the Office of the Attorney General, the Board shall order the suspension of a license if the licensee is convicted of or pleads guilty or nolo contendere with respect to a crime involving moral turpitude, whether or not any appeal or other proceeding is pending to have the conviction or plea set aside.

(2) After completion of the appellate process if the conviction has not been reversed or the plea has not been set

---

**2.** S.G. §§ 10–101 to 10–305 contain the Administrative Procedure Act. Section 10–223 provides: "A party who is aggrieved by a final judgment of a circuit court under this subtitle may appeal to the Court of Special Appeals in the manner that law provides for appeal of civil cases."

aside with respect to a crime involving moral turpitude, the Board shall order the revocation of a license on the certification by the Office of the Attorney General.

"Moral turpitude" is defined in COMAR 10.32.02.02(B)(19) as "conduct evidencing moral baseness of the respondent as determined on a case-by-case basis under common law." COMAR 10.32.01.01, which pertains to physicians, states: "These regulations govern how an individual becomes licensed in Maryland to practice medicine." Moreover, COMAR 10.32.02.01 states: "These regulations govern procedures for disciplinary and licensing matters before the Board of Physicians." Chapter 01 is titled "General Licensure Regulations," while Chapter 02 is titled "Hearings Before the Board of Physicians."

## FACTUAL SUMMARY

Appellant enlisted in the United States Navy in November of 1969, from which he retired on March 1, 1995. In 1976, appellant became a physician assistant; he has been certified to practice in Maryland since 1991. From 1996 through 1998, Oltman worked under contract as a civilian physician assistant at the Naval Academy in Annapolis and at the National Naval Medical Center in Bethesda.

As a Navy retiree, appellant received free medical care and prescriptions for himself, his wife, and his children, until the children reached the age of twenty-one, or twenty-three if enrolled in college. Appellant's son, Carl Oltman, Jr. ("Junior"), turned twenty-one years of age on May 3, 1996, and did not attend college. Therefore, as of May 3, 1996, Junior became ineligible for health benefits under appellant's Navy medical coverage.

Junior has Attention Deficient Hyperactive Disorder ("ADHD"), for which he was prescribed Ritalin, a controlled substance, or its generic equivalent. After Junior reached the age of twenty-one, appellant continued to obtain Ritalin for his son through the Navy, even though Junior was no longer eligible for prescription benefits through appellant's medical

coverage. Appellant's conduct in obtaining medication for his son, knowing his son was ineligible for such medical benefits, led to appellant's prosecution in federal court.

In June 1999, the United States Attorney for the District of Maryland filed an Information against appellant, alleging that, "by fraud, deceit, misrepresentation, and subterfuge," appellant "knowingly and intentionally" "forged and altered prescriptions and written orders for prescriptions for Methylphenadite; and concealed facts in order to obtain prescriptions for Methylphenadite," in violation of Md. Ann. Code (1996 Repl. Vol.), Art. 27, § 300,[3] and the Assimilated Crimes Statute, 18 U.S.C. § 13 (2000).

The Information was filed pursuant to a plea agreement between appellant and the United States, detailed in a letter dated April 26, 1999, written by Bonnie S. Greenberg, Assistant United States Attorney, and signed by appellant and his lawyer on May 28, 1999. The letter set forth the following statement of facts:

> On or about September 27, 1998, the National Naval Medical Center received a prescription for Methylphenidate (a generic equivalent of Ritalin) over the Composite Health Care System (CHCS) allegedly written by a physician for Mr. Oltman. However, the physician did not write the prescription for Mr. Oltman. Rather, Mr. Oltman accessed the CHCS terminal in the National Naval Medical Center in Bethesda, Maryland, and generated a prescription for Methylphenidate on September 27, 1998 in Bethesda, Maryland. Mr. Oltman also generated prescriptions for Methylphenidate by accessing the CHSC [sic] terminal on July 18, 1996, October 17, 1996, November 6, 1996 at the Naval Medical Center in the U.S. Naval Academy, Annapolis, Maryland.
>
> Further, Mr. Oltman deceived others and concealed material facts in requesting that others authorized to issue

---

**3.** Article 27, § 300 was repealed by Acts of 2002. Effective October 1, 2002, it was recodified in the Criminal Law Article of the Maryland Code, §§ 5–101, 5–103, and 5–701 to 5–704.

prescriptions at the Naval Medical Clinic in the U.S. Naval Academy, Annapolis, Maryland issue him prescriptions for Methylphenidate on October 17, 1998, August 18, 1998, August 16, 1998, May 8, 1998, July 22, 1998, March 19, 1998, December 9, 1998, October 20, 1997, and July 22, 1997.

At all times herein, between April 15, 1996 and October 1, 1998, Methylphenidate was a prescription drug and a controlled substance under 21 C.F.R. §§ 1300.01 and 1308.12. Mr. Oltman received this prescription drug, Methylphenidate, numerous times between April 15, 1996 and October 1, 1998 by forging or altering a prescription or written order; by fraud, deceit, misrepresentation, and subterfuge; and concealed material facts in order to obtain and attempt to obtain the prescription drug.

The defendant's son, Carl Oltman, Jr., uses Methylphenidate and became ineligible to receive medical benefits in May 1996, as he turned 21.

On July 15, 1999, appellant formally tendered a guilty plea in federal court to the charge of violating Title 18, § 13 of the U.S.Code and Article 27, § 300 of the Maryland Annotated Code. On September 8, 1999, the federal court (Garbis, J.) sentenced appellant to two years of probation, a $1,000 fine, and $1,208.43 in restitution.

As a result of appellant's criminal conviction, on January 11, 2000, the Navy revoked appellant's clinical privileges and terminated his staff appointment. The Navy also notified the Board of its action on December 12, 2000.

On August 20, 2001, the Department of Health and Mental Hygiene (the "State"), filed with the Board a "Petition to Revoke the Respondent's Physician Assistant Certificate." It relied on the Maryland Medical Practice Act, H.O. §§ 15–314(3) and 14–404(b). In particular, the State sought a mandatory revocation of appellant's physician assistant certificate because of his "plea of guilty to obtaining Controlled Dangerous Substances by fraud, deceit, misrepresentation and subterfuge," claiming it "constitutes a crime involving moral turpitude."

The Board issued an order on August 22, 2001, requiring appellant to "show cause, if there be any, in writing ... why his certificate to practice as a physician assistant should not be revoked." In his answer, appellant asked the Board to deny the petition, arguing that H.O. § 14–404(b) applies to physicians but not to physician assistants. He also claimed that, under H.O. § 15–315(a), he was entitled to an evidentiary hearing. In addition, appellant argued that his misdemeanor conviction did not constitute a crime of moral turpitude. Moreover, he maintained that the Board was not required to suspend or revoke his certificate, given various mitigating factors.

In its response, the State argued that H.O. § 14–404(b)(2) is made applicable to physician assistants by H.O. § 15–314(3). Moreover, it contended that appellant was not entitled to an evidentiary hearing. And, the State asserted that the offense for which appellant was convicted constituted a crime of moral turpitude.

In a "Memorandum" of December 4, 2001, the Board referred the matter to the Office of Administrative Hearings ("OAH") for a hearing by an Administrative Law Judge ("ALJ"), pursuant to the State Government Article. A flurry of pleadings preceded the administrative hearing.

At the hearing held by the ALJ on March 20, 2002, the State argued that H.O. § 14–404(b), which subjects a physician to license revocation upon conviction of a crime of moral turpitude, also applies to physician assistants, because H.O. § 15–314(3) incorporates by reference H.O. § 14–404(b). Appellant countered that the mandatory license revocation provision applicable to physicians does not apply to physician assistants, and thus the Board could opt to reprimand or suspend a physician assistant, instead of imposing a revocation. Further, appellant argued that the legislative history demonstrated that the General Assembly chose not to amend H.O. § 15–314 to include the mandatory license revocation required by H.O. § 14–404.

On April 17, 2002, the ALJ issued an "Order on Motions," a twelve-page opinion addressing whether appellant, "a physician assistant, is subject to the mandatory license revocation law applicable to physicians" under H.O. § 14–404(b). Concluding that a plain reading of the Maryland Physician Assistants Act "incorporates the acts listed in § 14–404, but not the procedures," the ALJ determined that appellant is not "subject to the mandatory license revocation provisions of § 14–404(b)(2)." Therefore, the ALJ remanded the matter to the Board for further proceedings, including a Case Resolution Conference ("CRC").

Then, on September 13, 2002, the Board issued a "Reversal of Dismissal and Interim Order of Remand," in which it treated the ALJ's "remand" as an "order of dismissal, dismissing the case for lack of a prior Case Resolution Conference." The Board was of the view that appellant could be charged with a violation of any of the grounds listed in H.O. § 14–404, but that the procedures set forth in that provision did not apply. Rather, the Board determined that the procedures of the Physician Assistants Act, found in Title 15 of the Health Occupations Article, applied to appellant. In particular, H.O. § 15–315 entitled appellant to a hearing in accordance with the provisions of the State Government Article. The Board also concluded that Mr. Oltman was not subject to the mandatory revocation provisions of H.O. § 14–404(b)(2). However, it ruled that the "statutory requirement" for a CRC applies to physicians, not physician assistants. Accordingly, the Board remanded the matter to OAH for a contested case hearing "on the merits," and for the "issuance of proposed findings of fact, conclusions of law and, if justified by the conclusions of law, a proposed sanction."

The ALJ conducted an evidentiary hearing in November of 2002, pursuant to the contested case provisions of the Administrative Procedure Act, S.G. § 10–201 *et. seq.*, and COMAR. The parties stipulated that appellant's son turned twenty-one in May of 1996, and that L. Dean Hoover, M.D., a licensed Maryland psychiatrist, prescribed Ritalin for Junior for

ADHD from 1994 to 1996, and beginning in 2000, but not in 1997, 1998, or 1999.

Richard Walton, a compliance analyst for the Board, was the sole witness for the State. The State entered into evidence certified copies of appellant's federal conviction in *U.S. v. Oltman*, Case No. MJG–990238; the docket sheets; the Information; the signed plea agreement; and the complaint from the Navy to the Board. Among other things, the documents showed that, on September 8, 1999, appellant was found guilty of one count of "obtaining a prescription drug by fraud, deceit, misrepresentation or subterfuge," in violation of Md.Code, Art. 27, § 300 and 18 U.S.C. § 13, and that the offense occurred on October 1, 1998. The parties also stipulated that appellant's son "requires Ritalin" for his ADHD.

Appellant, who was then fifty-four years old, testified in his own defense. The following testimony is pertinent:

[APPELLANT'S COUNSEL]:. . . . Where were you working on September 27, 1999?

[APPELLANT]: At what's called the MACC, the Medical Acute Care Clinic, National Naval Medical Center.

[APPELLANT'S COUNSEL]: And can you tell the Administrative Law Judge what happened on that day?

[APPELLANT]: Yes, sir. On that day, I walked into another doctor's office, I put a prescription on his computer. It's the worst mistake I ever made in my life. I'm sorry for that. And I've learned from that mistake never to do it again. That's for sure. But the pharmacy called this doctor and said, "Is this your patient?" And the doctor said "No." So he came to me and he said, "Did you put this prescription in there?" And I said, "Yes, I did. It's a mistake. Cancel it." It was never picked up. The prescription was never picked up and used.

[APPELLANT'S COUNSEL]: In the name of whom did you write that prescription?

[APPELLANT]: I wrote that prescription in the name of my son, Carl Frederick Oltman, Junior.

[APPELLANT'S COUNSEL]: And what was the prescription for?

[APPELLANT]: Ritalin or Methylphenidate.

Appellant acknowledged that he also asked doctors to write prescriptions for his son, that the doctors did not ask appellant whether his son was "eligible for care," and that appellant "never said anything" to the doctors about his son's ineligibility. He maintained, however, that the stipulation of facts contained in his plea agreement included instances of misconduct that did not actually occur. Nevertheless, appellant acknowledged that, when he obtained the Ritalin prescriptions for his son, he was aware that he would not be billed for them because of his eligibility for medical benefits as a Navy retiree. Moreover, appellant conceded that his actions constituted "theft."

Mary Oltman, appellant's wife, described her son's difficulty maintaining a job without Ritalin. Junior testified that he received Ritalin from his father between 1997 and 1998. On cross-examination, he acknowledged that he did not visit a doctor to obtain the medication.[4]

At the conclusion of the evidence, the State argued that, because fraud is an element of the crime for which appellant was convicted, he committed a crime of moral turpitude. Appellant countered that he was convicted of a misdemeanor, not a felony, and the offense was not a crime of moral turpitude. Further, he argued that he was convicted of a crime under Art. 27, § 300, and fraud is not the only action proscribed by that section. Rather, Art. 27, § 300(g–1)(2)(i) includes deceit, misrepresentation, and subterfuge, (ii) includes forgery, (iii) includes concealing a material fact, and (v)

---

4. Appellant also presented the testimony of several other witnesses, including John Holt, Esquire, a retired Naval Officer who was appellant's neighbor for a period of time, as well as appellant's patient; David Thompson, the regional manager for Prison Health Services, the company for which appellant worked as a physician assistant at the time of the hearing; and Thelma Doyle, a family friend and former patient. Although these witnesses offered favorable comments about appellant, their testimony is not pertinent to the issues on appeal.

includes uttering a false prescription. In appellant's view, misrepresentation and subterfuge are not the same as fraud, and thus forging a prescription, concealing a material fact, or uttering a false prescription do not necessarily constitute fraud.

On January 31, 2003, the ALJ submitted a "Proposed Decision," concluding that appellant committed a crime of moral turpitude, in violation of H.O. §§ 14–404 and 15–314(3). The ALJ said: "Deceitfully obtaining prescription drugs over such a long period of time shows a serious lack of integrity for which revocation is an appropriate sanction." The ALJ found, in part:

5. On July 18, 1996, October 17, 1996, November 6, 1996, and September 27, 1998, [appellant] used a physician's computer to write prescriptions for his son for Ritalin. The [appellant's] son was not eligible for medical coverage through the Department of the Navy at the time [he] wrote the prescriptions. The prescriptions were filled at Naval pharmacies at either the Naval Medical Clinic, Annapolis, Maryland, or at the National Naval Medical Center, Bethesda, Maryland. The prescriptions were paid by the [appellant's] Naval medical benefits.

6. On July 22, 1997, October 20, 1997, March 19, 1998, May 8, 1998, July 22, 1998, August 16, 1998, August 18, 1998, October 17, 1998, and December 9, 1998, the [appellant] requested that Navy physicians write prescriptions for Ritalin for his son.

7. Navy physicians did write those prescriptions but did not examine [appellant's] son prior to writing the prescriptions. The [appellant's] son was not eligible for coverage through the Department of the Navy at the time [he] requested the prescriptions. Prescriptions written by Naval physicians could not be filled and paid for at civilian pharmacies. The prescriptions were filled at Naval pharmacies at either the Naval Medical Clinic, Annapolis, Maryland, or at the National Naval Medical Center, Bethesda, Maryland. The prescriptions were paid by the Respondent's Naval medical benefits.

8. On September 8, 1999, the Respondent pled guilty to one count of obtaining a prescription drug by fraud, deceit, misrepresentation, or subterfuge. He was given probation for two years and ordered to pay restitution in the amount of $1,208.43.

In determining that appellant's conduct constituted a crime of moral turpitude, the ALJ reasoned:

The term "moral turpitude" connotes a fraudulent or dishonest intent. *Attorney Grievance Commission v. Klauber*, 289 Md. 446, 457, 423 A.2d 578 (1981), citing *Attorney Grievance Commission v. Walman*, 280 Md. 453, 374 A.2d 354 (1977). While not every misdemeanor conviction is a crime of moral turpitude, a "crime in which an intent to defraud is an essential element is a crime involving moral turpitude." *Id.* at 459, 423 A.2d 578, citing, *In re Hallinan*, 43 Cal.2d 243, 272 P.2d 768, 771 (1954), *appeal after remand*, 48 Cal.2d 52, 307 P.2d 1 (1957). Further, crimes "involving *intentional dishonesty* for purposes of personal gain are crimes involving moral turpitude...." *Id.* at 459–460, 423 A.2d 578. (Emphasis in original) The Respondent specifically pled guilty to obtaining a prescription drug by fraud, deceit, misrepresentation, or subterfuge. (Bd. # 3). He cannot now successfully argue that he pled guilty to concealing a material fact.

Further, the Respondent was intentionally dishonest. He admitted that he wrote at least one prescription himself using a physician's computer and, numerous times, he had physicians write prescriptions for his son when the physicians had not examined his son. The Respondent wrote or obtained the prescriptions with full knowledge that his son was no longer covered by the Respondent's medical benefits, that the prescriptions would have to be filled at a Naval pharmacy, and that the Navy would pay for the prescriptions when filled at the Naval pharmacy.

Finally, the Respondent not only falsely obtained prescriptions using a physician's computer, he also drew other physicians into his actions. While it was the physicians' decision to issue the prescriptions without examining the

Respondent's son, the Respondent asked them to participate in a fraud because he knew that his son was not covered by his benefits and that the Navy would pay for the prescriptions. The Respondent's crime, although a misdemeanor, was willfully dishonest, and characterized by fraud and deceit. Thus, it was a crime of moral turpitude.

The ALJ also determined that "the Board is within its statutory right to revoke the [appellant's] physician assistant certificate, notwithstanding the [appellant's] testimony that he was just assisting his son." In regard to the appropriate sanction, the ALJ did not find that appellant's conduct resulted from "compelling extenuating circumstances." The ALJ stated:

It is unreasonable to believe that the Respondent's son could not take off work at sometime during those years to see a physician. The period of time over which the Respondent wrote or obtained the prescriptions leads to the reasonable inference that the Respondent obtained the prescriptions fraudulently because his son was no longer covered by the Respondent's medical benefits and the Respondent and/or his son could not or would not pay for the medication.

Accordingly, the ALJ concluded that the Board "properly revoked" appellant's Physician Assistant Certificate because of his conviction. The ALJ said: "I PROPOSE that the Board of Physician Quality Assurance's revocation of the [Appellant's] Physician Assistant Certificate be UPHELD."

On February 7, 2003, the State submitted a letter to the Board, captioned "Proposed Correction of ALJ's Proposed Decision, Findings of Fact and Conclusions of Law ....", seeking to correct a "minor error." It conceded that the "Proposed Order" should have read: "I PROPOSE that the Board of Physician Quality Assurance revoke the [Appellant's] Physician Assistant Certificate."

Appellant filed "Exceptions to Proposed Decision of Administrative Law Judge." He argued that the ALJ "erroneously inferred that the [Board] had decided to revoke [Appellant's]

Certificate, when, in fact, there had been no such decision, and, therefore, the ALJ applied the wrong standard insofar as proposing a sanction." Appellant also contended that the ALJ erroneously concluded that appellant pled guilty to a crime of moral turpitude.

At the exceptions hearing on April 23, 2003, appellant again argued that his underlying criminal conviction did not constitute a crime of moral turpitude. He asserted, as "the starting point," that COMAR 10.32.02.02.19 provides "that the determination of whether or not a crime is a crime involving moral turpitude is 'determined on a case by case basis under common law.'" Appellant's counsel said:

> The term moral turpitude, while imprecise, denotes conduct which is "base or vile and contrary to the accepted and customary conduct between men." Those are the same. Moral turpitude suggests, therefore, "such disregard for social values on the part of the perpetrator that one could reasonably infer that such a person's testimony is suspect."
>
> * * *
>
> But the regulation that applies in this case talks about the common law and about analyzing these cases on a case by case basis.

Appellant also contended that, even if the crime was one of moral turpitude, the ALJ "lost her perspective," because she did not "realize" or "understand" that "the full penapoly [sic] of potential sanctions were available," and the Board was not required to impose a revocation. His lawyer argued:

> [O]ur position is that Mr. Oltman pled guilty to a misdemeanor and that the Administrative Law Judge erroneously concluded that that misdemeanor constituted a crime involving mortal turpitude. We believe that if we apply the standard of the regulations, it simply is not that kind of crime and does not, therefore, justify any sanction. But, again, we stand here ready to accept any sanction that allows him to continue to practice.

The State acknowledged that the ALJ was confused in proposing to uphold the Board's revocation, given that the

Board had not yet decided to revoke appellant's Certificate. Nevertheless, it claimed that the ALJ's factual findings supported her conclusion that appellant was convicted of a crime of moral turpitude. The State asserted:

We met our burden of proof with clear and convincing or—actually, I believe in this case we only need a preponderance of the evidence. But we met it by clear and convincing that he was convicted of State and Federal crimes. Those crimes consisted of crimes of moral turpitude with long precedent in this State.

\* \* \*

Insurance fraud is a crime of moral turpitude. We found it at this Board by the State many times in the past. It's a crime of moral turpitude for any health care professional. And the fact that it is a misdemeanor allegedly in the State has no bearing on this.

Further, the Department argued:

Calling this behavior honorable is condoning theft. And that's basically what it is. It's insurance fraud. Theft of maybe a small amount of money, relatively, but theft. Whether it's theft from the tax payers of $1,500 or $15,000, basically is [sic] theft.

\* \* \*

And the only reason that the behavior stopped in '98 was he got caught.

\* \* \*

And whether or not he was convicted of a felony or a misdemeanor is of no consequence in this state.

\* \* \*

I hate to beat the facts to death, but I'm going to have to here. When Mr. Oltman was employed with the Navy for a two-year period, he fraudulently obtained and wrote prescriptions for methylphenidate, Ritalin, for his son. His son had health insurance elsewhere. His son didn't choose to use that health insurance elsewhere. That is fully testified to in the record, admitted to by Carl Oltman, Jr.

.

These prescriptions, his son did not see a physician from 1996 to 1998. His father, a physician's assistant, was prescribing Ritalin for him. Now, he was not charged with practicing medicine without a license, but something there quite isn't right. So, he fraudulently wrote prescriptions. He fraudulently induced other Naval guys, Naval men and women physicians, to provide prescriptions and then went and filled them at the Naval pharmacy when the child didn't have the—young adult did not have benefits. That is theft.

He signed the plea. And the plea is final. And with regard to the procedure in this case, no matter what went on with the V–2s and the 14–404s and the 15–314s, he's had a full evidentiary hearing. The whole process that any other health care professional gets in this type of thing. He was found guilty for obtaining prescription drug by fraud, deceit, misrepresentation or subterfuge in violation of the Annotated Code.

* * *

Deceitfully obtaining prescription drugs over a long period of time shows a serious lack of integrity in which revocation is the appropriate sanction. And the State submits that sanction is absolutely appropriate under the circumstance.

The Board issued a "Final Decision and Order" on August 11, 2003. It concluded that, pursuant to H.O. § 15–314, "given the nature and long-term pattern of Mr. Oltman's willful and fraudulent criminal acts, revocation of his physician assistant certificate is warranted."

In its opinion, the Board adopted the ALJ's proposed factual findings and her analysis. However, acknowledging that the ALJ's "Proposed Order" was improperly worded, the Board "amend[ed] the ALJ's Proposed Order ... to state: 'I propose that the [Board] revoke the [appellant's] Physician Assistant Certificate,' and adopts that Proposed Order as amended." The Board explained:

The Board ... had not revoked Mr. Oltman's physician assistant certificate prior to the administrative hearing.

Pursuant to its authority under Md.Code Ann., State Gov't § 10–216(b), in this Final Decision and Order, the Board will therefore modify the ALJ's Proposed Decision to reflect that no disciplinary action had been taken by the Board against Mr. Oltman at the time of the hearing. The ALJ apparently misunderstood her role to some extent. The ALJ was not hearing an appeal of an action of the Board already taken, but was delegated the role of making proposed findings of fact and conclusions of law to the Board.

In its ruling, the Board recognized that "fraud was an essential element of Mr. Oltman's crimes." Therefore, it was of the view that appellant pled guilty to a crime of moral turpitude. Moreover, it determined that appellant "violated HO §§ 15–314(3) and 14–404(b) of the Maryland Medical Practice Act because of his conviction for obtaining a prescription by fraud, deceit, misrepresentation, or subterfuge, in violation of 18 U.S.C. § 13 and Md.Code Ann., Art. 27, § 300." The Board reasoned:

In 1996 and 1998, Mr. Oltman deliberately used a physician's computer to write Ritalin prescriptions for his adult son whom he knew was then ineligible for medical insurance under Mr. Oltman's navy medical benefits plan. On numerous other occasions from 1997 through 1998, Mr. Oltman also persuaded Navy physicians to write Ritalin prescriptions without examining his son, concealing the fact that his son was no longer eligible for their free services. Mr. Oltman then fraudulently filled these prescriptions at naval pharmacies at no cost to himself or his son. Mr. Oltman continued his established pattern of defrauding the navy medical benefits plan by obtaining Ritalin prescriptions from naval pharmacies throughout 1998.

Mr. Oltman and his son both profited financially by obtaining these prescriptions illegally. Fraudulent use of the navy benefits plan was a convenient way to avoid payment to a civilian physician for an examination or to a pharmacy for medication. Mr. Oltman's readiness to exploit his ex-employer's health benefit system for free goods and services to which he was not entitled, as well as the long-

standing and repetitive nature of this conduct, undermine public confidence in the integrity of the physician assistant profession. Similarly, Mr. Oltman's lack of honesty and perpetration of this fraud over a long period of time disparages professional principles and dishonors the reputation of the great majority of physician assistants who practice with honesty.

There is no dispute that fraud was an essential element of Mr. Oltman's crimes. In light of Mr. Oltman's deliberate forgery of prescriptions and continuous receipt of fraudulently-obtained prescription medication from 1996 through 1998, the Board finds that the crimes to which he pled guilty were crimes of moral turpitude. The character evidence presented by Mr. Oltman does not lessen his culpability. The circumstances of his case do not diminish the seriousness of his criminal violations or his violation of the Medical Practice Act.

As to the sanction, the Board said:

[W]ith respect to all other health professionals that it regulates, the legislature has mandated that, for crimes of moral turpitude, the sanction be revocation of the certification or license. *See* HO §§ 14–404(b)(2) (physicians), 14–5A–18(c)(2) (respiratory care practitioners), and 14–5B–14(c)(2) (medical radiation technologists). (2002 Supp.) *The Board recognizes that it has statutory authority to deviate from this sanction in the case of physician assistants, but the Board declines to do so in this case.*

(Emphasis added).

Appellant subsequently sought judicial review in the circuit court. In his memorandum, appellant contended, *inter alia,* that he was not convicted of a crime of moral turpitude. Appellant also argued that both the ALJ and the Board failed to give "fair consideration to whether revocation was an appropriate sanction...." And, appellant asserted that the Board acted arbitrarily in denying him a CRC.

In its opposing memorandum, appellee contended that the Board's findings were "supported by substantial evidence in

the record. . . ." It argued that, "[u]nder Maryland case law, conviction of a crime in which fraud is an essential element, is a crime of moral turpitude." In the alternative, appellee claimed that, even if fraud is not an essential element of appellant's crime, the facts and circumstances surrounding his conduct nonetheless warranted a finding of moral turpitude.

Moreover, appellee asserted that the Board's sanction was within its discretion, and "a reasoning mind could have reasonably concluded" that revocation of appellant's certificate was appropriate. It also argued that the circuit court lacked jurisdiction "to reverse or modify the sanction imposed by the Board." Finally, appellee stated that the Board correctly determined that appellant was not entitled to a CRC, because such a procedure is only available to "licensees charged with conduct violating HO § 14–404(a)," and appellant was charged under subsection (b) of that statute.

The circuit court (Davis–Loomis, J.) held a hearing on February 2, 2004, at which appellant reiterated many of the arguments he previously advanced. Among other things, appellant complained that, initially, the Board erroneously "took the position that Mr. Oltman was subject to mandatory, automatic revocation of his certificate as a Maryland physician's assistant, under Section 14–404(b) of the Health Occupations Article." Appellant also maintained that his actions did not amount to moral turpitude.

Appellee countered that there was "substantial evidence in the record to support the Board's decision." Moreover, it argued that "there is no support in the record for Mr. Oltman's latest claim that the Board always intended mandatory revocation to apply to him, or that the denial of a case resolution conference was somehow retaliatory." According to appellee, "the Board disagreed with the Administrative prosecutor [sic] for the State, and agreed with Mr. Oltman from the very beginning of this case that no discipline could be imposed until Mr. Oltman received an evidentiary hearing." But, appellee maintained that "there is no procedural right to a CRC in a moral turpitude case in the Medical Practice Act."

The circuit court affirmed the Board. In its "Memorandum Opinion," filed on February 23, 2004, the court stated: "Appellant's crime was one of moral turpitude regardless of the context. . . . Appellant's actions clearly constitute actions of moral turpitude within the broader administrative context of the term." In its well reasoned opinion, the court said:

> It is settled that whatever else it may mean, moral turpitude includes fraud and that a crime in which an intent to defraud is an essential element is a crime involving moral turpitude. . . .

> The term "moral turpitude" itself does not refer to any distinct set of crimes. . . . However, crimes involving moral turpitude include those "in which an intent to defraud is an essential element." [(Citations omitted)]. "It is also settled that the related group of offenses involving intentional dishonesty for purposes of personal gain are crimes involving moral turpitude." [(Citations omitted)].

> It is clear from the evidence in the record that the Board and the ALJ were presented with substantial evidence to believe that the Appellant was convicted of a crime of moral turpitude. The ALJ heard from numerous witnesses, including the Appellant himself, regarding the Appellant's criminal actions. It is also undisputed that the Appellant pled guilty to obtaining a prescription by "**fraud,** deceit, misrepresentation and subterfuge."

> Further, the law in Maryland is clear that a crime that includes fraud, deceit, misrepresentation and subterfuge as elements is one involving moral turpitude.

* * *

> Appellant points out that the crime was a misdemeanor and not a felony. However, this distinction does not determine whether a crime is one involving moral turpitude. . . . Appellant is correct in asserting that the facts of the case determine whether a crime is one of moral turpitude. *Id.* The facts of this case show that the appellant acted fraudulently, with intentional dishonesty, and for a personal benefit. These facts, which were

before the Board and the ALJ, establish a crime of moral turpitude.

* * *

Further, it has been established that the term "moral turpitude" has a broader definition in the context of an administrative hearing than it does in a criminal matter.

* * *

Because "moral turpitude" in the administrative context speaks primarily to public confidence in the profession, there is little doubt that Appellant's actions involve moral turpitude. The Appellant was intentionally untruthful and used others to help in his deceitful actions. Further, the Appellant's actions directly related to the profession that the Appellant was licensed to perform.

Regarding the issue of the sanction, the court was satisfied that the ALJ and the Board gave fair consideration to the appropriate sanction and the Board acted within its statutory discretion to revoke appellant's certificate. The court said: "Although the Board changed the ALJ's Proposed Decision to reflect the fact that the Board had not yet acted with respect to Appellant's certificate before August 11, 2003, this had no effect on the Board's determination as to the imposition of the sanction of revocation."

In addition, the court determined that, because "neither the ALJ nor the Board determined that Appellant was being prosecuted under § 14–404(a) ... the holding of a Case Resolution Conference would not be appropriate." It concluded that, even if a CRC were available, it would nonetheless affirm the Board's decision, because the parties did not demonstrate that they had a "basis for an agreement." The court reasoned:

> Further, even if a Case Resolution Conference were requested, this proceeding is conducted to explore the possibility of a resolution on the matter. COMAR 10.32.02.03C(7)(a). If there is no basis for an agreement, the matter proceeds to a hearing. COMAR 10.32.02.03C(7)(b). It is clear from the record that the

State was determined to seek revocation. At the outset of the case, the State was seeking a mandatory revocation of Appellant's certificate. *Id.* There is no evidence in the record that shows that the State would seek any other sanction. Thus, even if a Case Resolution Conference were held, the matter would have proceeded in the same manner as occurred.

## DISCUSSION

### I.

Appellant contends that the ALJ, the Board, and the circuit court erred by finding that appellant's underlying criminal conviction constituted a crime of moral turpitude. He insists that "fraud" is "not a necessary element" of the crime of which he was convicted and, "since there was no evidence adduced against [him]" in federal court, "there is nothing in [the] record that supports the conclusion that he pled guilty to fraud." Appellant adds that "the inclusion of the word 'fraud' in a statute does not automatically convert the acts thereby prohibited into a crime involving moral turpitude."

Further, appellant maintains that the ALJ, the Board, and the circuit court all "ignored the distinction between felonies and misdemeanors in determining whether a crime is one involving moral turpitude." Because his underlying conviction was "akin to shoplifting," says appellant, it did not amount to a crime of moral turpitude.

Appellee counters that appellant "committed a crime of moral turpitude as a matter of law." The Board contends that, under Maryland law, if fraud is an essential element of a crime, then the offense is necessarily a crime of moral turpitude. And, appellee maintains that, because the underlying facts of appellant's conviction unequivocally established "actual fraud and deceit," as well as "intentional dishonesty," the crime was one of moral turpitude. Further, the Board asserts that "the term 'moral turpitude' is more broadly defined in the context of Board licensure and discipline than in a witness impeachment context." And, argues appellee, "[t]he concept

of moral turpitude ... does not rest on ... a distinction" between misdemeanors and felonies.

■ We review the final decision of the administrative agency in accordance with the well established principles of administrative law. *See, e.g., Maryland Aviation Administration v. Noland,* 386 Md. 556, 570–73, 873 A.2d 1145, 1154–55 (2005); *Bd. of Physician Quality Assurance v. Mullan,* 381 Md. 157, 165, 848 A.2d 642 (2004); *Spencer v. Md. State Bd. of Pharmacy,* 380 Md. 515, 527–29, 846 A.2d 341 (2004). The task of a reviewing court is "not to substitute its judgment for the expertise of those persons who constitute the administrative agency." *Bd. of Physician Quality Assurance v. Banks,* 354 Md. 59, 68, 729 A.2d 376 (1999) (quotation marks omitted). The agency may "use its experience, technical competence, and specialized knowledge in the evaluation of evidence." S.G. § 10–213(I); *see Noland,* 386 Md. at 573 n. 3, 873 A.2d at 1155 n. 3 (recognizing that we give "considerable weight" to an agency's "interpretations and applications of statutory or regulatory provisions" that are administered by the agency).

■ On judicial review, " 'it is the *final* order of the administrative agency that is subject to deferential judicial review.' " *Carriage Hill Cabin–John, Inc. v. Md. Health Res. Planning Comm'n,* 125 Md.App. 183, 220, 724 A.2d 745 (1999) (quoting *Dep't of Health & Mental Hygiene v. Shrieves,* 100 Md.App. 283, 296, 641 A.2d 899 (1994)); *see Gabaldoni v. Bd. of Physician Quality Assurance,* 141 Md.App. 259, 261, 785 A.2d 771 (2001) (same). Therefore, we review the Board's decision, not the decision of the ALJ.

## II.

■ Appellant contends that, because he was convicted of a misdemeanor, rather than a felony, the Board erred in finding that he committed a crime of moral turpitude, as required by H.O. §§ 14–404(b) and 15–314(3). In this regard, appellant does not cite any Maryland case law to support his claim that, for an offense to constitute a crime of moral turpitude, the offense must be a felony.

As noted, pursuant to the Assimilated Crimes Statute, 18 U.S.C. § 13 (2000), appellant pleaded guilty to a violation of Art. 27, § 300. In connection with his plea agreement, appellant admitted that he obtained Ritalin for his son "by forging or altering a prescription or written order; by fraud, deceit, misrepresentation, and subterfuge; and concealed material facts in order to obtain and attempt to obtain the prescription drug."

In relevant part, Article 27, § 300 provided:

### § 300. Prescription drugs.

\* \* \*

(g–1) *Manufacture, distribution, etc.; obtaining by fraud, forgery, concealment, etc.; forging altering or obliterating label.*—Except as authorized by this subheading it is unlawful for any person to:

\* \* \*

(2) Obtain or attempt to obtain a prescription drug by (i) fraud, deceit, misrepresentation, or subterfuge, (ii) the forgery or alteration of a prescription or a written order, (iii) the concealment of any material fact or the use of false name or address, (iv) falsely assuming the title of or representing himself to be a manufacturer, distributor or practitioner, or (v) making or uttering any false or forged prescription or written order.

\* \* \*

(h) *Penalty for violation of section.*—Any person who violates any of the provisions of this section, or refuses, neglects or fails to comply with the provisions and requirements thereof, or who obtains or possesses a prescription drug in violation of this section, shall be deemed guilty of a misdemeanor and upon conviction thereof shall be fined not more than one thousand dollars ($1,000) and/or imprisoned for not more than two (2) years, or both.

■ In the first instance, we agree with the Board that, in the context of a licensing board's review of the conduct of its licensee, the concept of moral turpitude is rather broad. We are guided by *Stidwell v. Md. State Bd. of Chiropractic*

*Exam'rs,* 144 Md.App. 613, 616, 799 A.2d 444 (2002), in which we concluded that the applicant's conviction for solicitation of prostitution constituted a crime of moral turpitude. Therefore, we held that the State Board of Chiropractic Examiners did not abuse its discretion when it denied an applicant's request for certification as a massage therapist, on the ground that the applicant had been convicted of a crime of moral turpitude. *Id.*

The *Stidwell* Court recognized that the term "moral turpitude" has a more expansive definition in the context of administrative law than at common law. Reviewing the term "moral turpitude," the Court said:

> The expression "moral turpitude" developed at common law. The tautological phrase described a category of offenses, known as infamous crimes, that precluded their perpetrators from testifying. Thus, "moral turpitude" itself does not refer to any distinct set of crimes. The infamous crimes, however, were treason, felony, perjury, forgery, and other *crimen falsi* offenses, which impressed upon their perpetrator such a moral taint that to permit the perpetrator to testify in legal proceedings would injuriously affect the public administration of justice.
>
> &#42; &#42; &#42;
>
> [Ms. Stidwell's] conviction ... surfaced in the field of administrative law, where "moral turpitude" has evolved from its common law trappings into an even more fluid descriptive tool. Indeed, while Maryland's administrative and regulatory statutes repeatedly use the phrase "moral turpitude," that use is variable and inconsistent.[ ] Our review of theses [sic] statutory provisions reveals that, whereas for trials, the expression "moral turpitude" speaks primarily to truthfulness, for the business of professional licensing and public appointments, the expression strikes the broader chord of public confidence in the administration of government. That is, a person who has credibility to testify may not have the public's confidence to practice certain professions or to serve on a governmental board.

*Id.* at 617–19, 799 A.2d 444 (citations and internal quotations marks omitted).

The different applications of the term "moral turpitude" are evident when we compare the Court of Appeals's decisions in *Bd. of Dental Exam'rs v. Lazzell,* 172 Md. 314, 191 A. 240 (1937), and *Ricketts v. State,* 291 Md. 701, 436 A.2d 906 (1981). We turn to review those cases.

In *Lazzell,* 172 Md. at 321–22, 191 A. 240, the Court of Appeals affirmed a decision by the Board of Dental Examiners to revoke a dentist's license because of his conviction for indecent exposure. In the Court's view, the dentist's conviction met the definition of "moral turpitude," because his "offense is so base, vile, and shameful as to leave the offender not wanting in depravity, which the words 'moral turpitude' imply." *Id.* at 321, 191 A. 240. Yet, in *Ricketts,* 291 Md. at 714, 436 A.2d 906, the Court determined that a prior conviction for indecent exposure was inadmissible to impeach the credibility of a defendant at his criminal trial. It reasoned, *id.* at 712, 436 A.2d 906:

> The first and most fundamental distinction we note between *Lazzell* and the case at bar is that the Court in *Lazzell* was assessing the propriety of a licensing board's determinations whereas here we are concerned with the cross-examination of a defendant in a criminal trial. In *Lazzell* the question was whether a dentist had violated the ethical standards of his profession. In the case *sub judice* the question is whether the conviction was relevant to an assessment of the credibility of a criminal defendant. Therefore, the light under which the conviction is examined as well as the effect it would produce on the examiners is drastically different.

Even if appellant's conduct were not subject to review by a licensing board, for which a broad definition of "moral turpitude" applies, we would nonetheless conclude that he committed a crime of moral turpitude. We explain.

In *Attorney Grievance Comm'n of Md. v. Klauber,* 289 Md. 446, 423 A.2d 578, *cert. denied,* 451 U.S. 1018, 101 S.Ct. 3008,

69 L.Ed.2d 390 (1981), the Court of Appeals concluded that, in the context of an attorney disciplinary action, a federal conviction for mail fraud constituted a crime of moral turpitude. The Court observed that, to convict an individual under the federal mail fraud statute, two elements had to be proved: " '(1) [A] scheme to defraud, and (2) the mailing of a letter, etc., for the purpose of executing the scheme.' " *Id.* at 450, 423 A.2d 578 (quoting *Pereira v. U.S.*, 347 U.S. 1, 8, 74 S.Ct. 358, 98 L.Ed. 435 (1954)). Because fraud was an essential element of the statute under which Klauber was convicted, the Court determined that Klauber had been convicted of a crime of moral turpitude. *Klauber*, 289 Md. at 457–59, 423 A.2d 578.

The *Klauber* Court cited to its decision in *Attorney Grievance Comm'n v. Walman*, 280 Md. 453, 374 A.2d 354 (1977). In *Walman*, the Court acknowledged that "not every conviction for failure to file [a tax return] is a crime involving moral turpitude ... [T]he issue depends on the particular facts of the individual case." *Id.* at 462, 374 A.2d 354. Because fraud was not an essential element of the misdemeanor federal tax offense at issue, the Court concluded that Walman's conviction did not necessarily constitute a crime of moral turpitude. *Id.* at 460, 374 A.2d 354. Of significance here, the Court said:

> **"Although the problem of defining moral turpitude is not without difficulty** (citations omitted), **it is settled that whatever else it may mean, it includes *fraud* and that a crime in which an intent to defraud is an essential element is a crime involving moral turpitude.** (Citations omitted). It is also settled that the related group of offenses involving *intentional dishonesty* for purposes of personal gain are crimes involving moral turpitude...." (Citations omitted; emphasis added).

*Walman*, 280 Md. at 459–60, 374 A.2d 354 (quoting *In re Hallinan*, 43 Cal.2d 243, 247, 272 P.2d 768, 771 (1954)) (boldface added) (italics added in *Walman*).

The *Walman* Court distinguished *Md. State Bar Assoc., Inc. v. Agnew*, 271 Md. 543, 318 A.2d 811 (1974). In *Agnew*, the Court held that former Vice President Spiro Agnew's

conviction under the federal felony tax evasion statute amounted to an act of moral turpitude sufficient to justify disciplinary action. *Agnew,* 271 Md. at 551, 318 A.2d 811. In contrast to the felony statute involved in *Agnew,* however, the *Walman* Court recognized that the misdemeanor tax statute at issue in *Walman* did not contain fraud as an essential element. *Walman,* 280 Md. at 457–58, 374 A.2d 354.

As we see it, appellant misinterprets *Walman.* The Court there did not conclude that a violation of a misdemeanor statute cannot amount to a crime of moral turpitude. Rather, it ruled that, when fraud is not an essential element of crime, the offense is not necessarily a crime of moral turpitude. *See also Attorney Grievance Comm'n of Md. v. Sperling,* 288 Md. 576, 577–78, 419 A.2d 1067 (1980) (recognizing that misdemeanor of passing bad checks totaling $250 constituted crime of moral turpitude); *Rheb v. Bar Ass'n of Balt. City,* 186 Md. 200, 204, 46 A.2d 289 (1946) (deciding that, for purposes of determining whether an underlying criminal conviction was an act of moral turpitude, "it is immaterial whether the federal crime is to be classed as a misdemeanor or a felony").

In this case, then, Oltman's guilty plea to a misdemeanor does not mean the offense was not one of moral turpitude. The statutory text makes clear that fraud is an essential element of the crime of which appellant was convicted. As noted, Art. 27, § 300(g–1)(2)(i) specifically prohibited "Obtain[ing] or attempt[ing] to obtain a prescription drug by (i) *fraud, deceit,* misrepresentation, or subterfuge." (Emphasis added). And, under the terms of the plea agreement, appellant explicitly acknowledged that he obtained prescriptions "by fraud." Moreover, appellant overlooks that, for a period of about three years, he deliberately and intentionally engaged in dishonest conduct for personal gain and with the intent to defraud.

We also agree with appellee that appellant "cannot now collaterally attack the conclusive final judgment of the criminal court in his case." *See Attorney Grievance Comm'n of Md. v. Sabghir,* 350 Md. 67, 710 A.2d 926 (1998); *Agnew,*

271 Md. at 548, 318 A.2d 811. To the contrary, the federal court's final judgment is "conclusive proof of [appellant's] guilt of the crime charged." *Bar Ass'n of Balt. City v. Siegel*, 275 Md. 521, 528, 340 A.2d 710 (1975).

The case of *Attorney Grievance Comm'n of Md. v. Bereano*, 357 Md. 321, 744 A.2d 35 (2000), supports our view. There, the Court disbarred Bereano based on his federal mail fraud conviction. Focusing on intent to defraud, *id.* at 330–31, 744 A.2d 35, the Court rejected Bereano's attempt "to minimize" his federal conviction "by analogizing it to a misdemeanor under state law." *Id.* at 336, 744 A.2d 35. Moreover, to the extent that appellant relies on the relatively minor amount of money involved in his misconduct, that argument does not compel the conclusion that his conduct did not amount to moral turpitude. The *Bereano* Court rejected a similar argument, stating: "A loss of $600, the amount found by the federal court for guidelines purposes in sentencing Bereano, is not minimal." *Id.* at 339, 744 A.2d 35.

Based on the rationale of the cases cited above, the Board was entitled to find that appellant's criminal conviction constituted a crime of moral turpitude.

## III.

Appellant contends that the Board failed to fairly consider "whether revocation was an appropriate sanction in Appellant's case." He points out that "the Board initially took the position that revocation of his Physician Assistant Certificate was automatic, and [the ALJ] clearly never understood that she was supposed to make a *proposed* finding as to what sanction ... should be imposed." (Emphasis added). Therefore, appellant asserts that he "was deprived of the consideration of the other potential sanctions, short of revocation, to which § 15–314 of the Health Occupations Article entitled him."

Claiming that the agency properly decided to revoke appellant's certificate, the Board asserts that "a reasoning mind could have reasonably concluded that the sanction [of revoca-

tion] was justified." Moreover, appellee contends that "[t]he determination of an appropriate sanction is the Board's prerogative." Furthermore, appellee asserts: "Neither the Administrative Procedure Act nor Maryland administrative case law authorizes a reviewing court to modify or reverse a sanction imposed by an administrative agency as long as the agency had statutory discretion to impose the sanction chosen."

 Although the Legislature mandates revocation for other health care licensees who commit crimes of moral turpitude, automatic revocation is not required for physician assistants who commit crimes of moral turpitude. *See, e.g.,* H.O. § 14–404(b) (physicians); H.O. § 14–5A–17 (respiratory care practitioners); H.O. § 14–5B–14(c)(2) (medical radiation technologists). Notably, the Board recognized that it was not required to revoke appellant's certificate. Rejecting the Administrative Prosecutor's position that the automatic revocation provisions applied to physician assistants, the Board agreed with appellant that he was entitled to an evidentiary hearing before any discipline could be imposed, and it delegated the case to OAH. In its "Reversal of Dismissal and Interim Order of Remand," the Board stated, in part:

> Mr. Oltman is charged with an offense which, were he a physician or a medical radiation technologist or a respiratory care practitioner, would result in summary action without, in most cases, any hearing at all. As it stands, Mr. Oltman has significantly more procedural rights than the other practitioners, including the procedural right to a contested case hearing under the Administrative Procedure Act.

Later, in its "Final Decision and Order," the Board observed that although license revocation would be mandatory if appellant were engaged in other fields of health care, it "has statutory authority to deviate from this sanction in the case of physician assistants." The Board resolved the matter of the sanction only after the entire evidentiary and exceptions process was completed.

The Board determined that, "given the nature and long-term pattern of Mr. Oltman's willful and fraudulent criminal acts, revocation of his physician assistant certificate [was] warranted." In reaching that decision, the Board exercised the discretion conferred upon it. It is not our function to second-guess that decision. As the Board states, "Neither the Administrative Procedure Act nor Maryland administrative case law authorizes a reviewing court to modify or reverse a sanction imposed by the administrative agency as long as the agency had statutory discretion to impose the sanction chosen."

*Mullan,* 381 Md. at 171, 848 A.2d 642, supports our view. There, the Court recognized that the Board has discretion as to the summary suspension of a physician. It noted that the Board's decision "is subject to judicial review under the arbitrary or capricious standard of [S.G.] § 10–222(h)(3)(vi)." *Id.* Further, the Court said: "The arbitrary or capricious standard ... sets a high bar for judicial intervention, meaning the agency action must be 'extreme and egregious' to warrant judicial reversal...." *Id.*

The *Mullan* Court cited *Md. Transp. Auth. v. King,* 369 Md. 274, 799 A.2d 1246 (2002). In *King,* the Court held that there was no authority under the Administrative Procedure Act or administrative law principles for the Court to review whether the Department of Transportation's decision to terminate Mr. King's employment was disproportionate to his offense. It said, 369 Md. at 291, 799 A.2d 1246:

> As long as an administrative sanction or decision does not exceed the agency's authority, it is not unlawful, and is supported by competent, material and substantial evidence, there can be no judicial reversal or modification of the decision based on disproportionality or abuse of discretion unless, under the facts of a particular case, the disproportionality or abuse of discretion was so extreme and egregious that the reviewing court can properly deem the decision to be "arbitrary or capricious."

More recently, in *Noland, supra,* the Court discussed the "limitation upon the judicial review authority of courts, with regard to a lawful and authorized sanction, imposed by an Executive Branch administrative agency." Overruling our decision in *Md. State Retirement Agency v. Delambo,* 109 Md.App. 683, 675 A.2d 1018 (1996), the Court explained, 386 Md. at 577, 873 A.2d at 1158:

> [W]hen the discretionary sanction imposed upon an employee by an adjudicatory administrative agency is lawful and authorized, the agency need not justify its exercise of discretion by findings of fact or reasons articulating why the agency decided upon the particular discipline. A reviewing court is not authorized to overturn a lawful and authorized sanction unless the "disproportionality [of the sanction] or abuse of discretion was so extreme and egregious that the reviewing court can properly deem the decision to be 'arbitrary or capricious.'" *MTA v. King, supra,* 369 Md. at 291, 799 A.2d at 1255–1256. Furthermore, the employing agency does not have the burden, in the reviewing court, of justifying such a sanction. Instead, in accordance with the principle that the agency's decision is prima facie correct and presumed valid, *Board of Physician Quality Assurance v. Banks, supra,* 354 Md. at 68, 729 A.2d at 381, the burden in a judicial review action is upon the party challenging the sanction to persuade the reviewing court that the agency abused his [sic] discretion and that the decision was "so extreme and egregious" that it constituted "arbitrary or capricious" agency action.

*See also Md. State Dep't. of Pers. v. Sealing,* 298 Md. 524, 539, 471 A.2d 693 (1984) (holding that "there was substantial evidence from which a reasoning mind reasonably could have concluded" that a correctional officer's conduct "was wantonly offensive and constituted sufficient cause for [his] removal from State service"); *Resetar v. State Bd. of Educ. of Md.,* 284 Md. 537, 563, 399 A.2d 225 (determining that reviewing courts "are not permitted to specify a sanction that we might have considered more appropriate"), *cert. denied,* 444 U.S. 838, 100 S.Ct. 74, 62 L.Ed.2d 49 (1979); *Hoyt v. Police Comm'r of Balt.*

*City,* 279 Md. 74, 89, 367 A.2d 924 (1977)(stating that "on judicial review a court may not substitute its judgment for that reached by the agency"); *Md. State Bd. of Soc. Work Exam'rs v. Chertkov,* 121 Md.App. 574, 585, 710 A.2d 391 (1998) (explaining that, "[e]ven in cases reviewing the severity of agency sanctions for arbitrariness or capriciousness, some Maryland cases have disposed of the entire issue purely on the basis of whether the decision to impose a sanction satisfies the substantial evidence test").

To the extent that the ALJ made any errors, such as by "upholding" a revocation that had not yet been imposed by the Board, the agency corrected her mistakes. It determined, independently, that appellant's prolonged conduct in forging prescriptions and receiving benefits to which he was not entitled demonstrated a lack of integrity that made him unfit to practice as a physician assistant.

## IV.

 Appellant contends that the Board acted arbitrarily and capriciously because it did not afford him a CRC. He argues that "the Board intended that Case Resolution Conferences be available to all professionals. . . ." Appellee counters that Oltman was not entitled to a CRC under the applicable statutory or regulatory provisions, or the APA. According to the Board, a CRC is only available if "a licensee is charged with conduct" that violated H.O. § 14-404(a). Oltman, however, was charged under H.O. § 15-314.

The definition of "Case resolution conference" is found in COMAR 10.32.02.02(B)(7). It defines a CRC as "a committee composed of Board members who make recommendations to the Board with regard to proposed disposition of matters before hearing."

COMAR 10.32.02.03 is also relevant. It states, in part:

**Proceedings [U]nder Health Occupations Article, § 14-404(a), Annotated Code of Maryland.**

\* \* \*

C. Prosecution of Complaint.

\* \* \*

(7) Case Resolution Conference.

(a) After service of charges or the response to the notice of intent to deny, the Board shall offer the respondent [5] a CRC which is a voluntary, informal, and confidential proceeding to explore the possibility of a consent order or other resolution of the matter.

(b) If there is no basis for an agreement between the respondent and the administrative prosecutor, the matter proceeds to a hearing.

\* \* \*

(f) *A health care provider may request the Board to schedule a CRC to address disciplinary matters before the issuance of formal charges.*

(Emphasis added).

Appellant focuses on the word "health care provider" in COMAR 10.32.02.03(C)(7)(f), suggesting that the term encompasses physician assistants because they, too, are health care providers. But, appellant overlooks that the provision is included under a heading of "Proceedings [U]nder Health Occupations Article, § 14–404(a)." In turn, H.O. § 14–404(a) contains forty separate grounds for which a *physician* may be disciplined. To illustrate, the grounds include incompetence (§ 14–404(a)(4)); habitual intoxication (§ 14–404(a)(7)); and abandonment of a patient (§ 14–404(a)(6)).

Here, the proceedings were initiated under H.O. Title 15, not H.O. Title 14. The Board determined that, because appellant was charged under H.O. § 15–314(3), appellant was subject to the procedural mechanisms of H.O. Title 15, even

---

5. "Respondent" is defined in COMAR 10.32.02.02(28) as follows:

"Respondent" means an individual health care provider, subject to the jurisdiction of the Board, who has been:

(a) Given notice to answer allegations concerning violations of the Medical Practice Act and COMAR 10.32.07;

(b) Notified as to potential emergency suspension pursuant to State Government Article, § 10–226(c), Annotated Code of Maryland; or

(c) Notified as to a potential violation of Health Occupation Article, § 14–601, Annotated Code of Maryland.

though the provisions of H.O. § 14–404(b) were cross-refer-
enced. In its "Reversal of Dismissal and Interim Order of
Remand," the Board stated: "Section 15–314 speaks of a 'basis
for disciplinary action' set out in 14–404, but there is no
indication that the procedures of 14–404 are meant to be
applied to physician assistant discipline under 15–314." Fur-
thermore, the Board observed that appellant had argued for
application of the procedures set forth in H.O. § 15–314, and
not H.O. § 14–404.

The provisions of COMAR 10.32.02.04 support the view that
a physician assistant is not entitled to a CRC. COMAR
10.32.02.04 is titled: "Proceedings under Health Occupations
Article, §§ 14–404(b), 14–5A–17(c), and 14–5B–14(c), Annotat-
ed Code of Maryland." Its definition of a "health provider"
does not include a physician assistant. It states, in part:

A. In this regulation, "health provider" means an indi-
vidual who is a:

(1) Licensed physician;

(2) Licensed respiratory care practitioner;

(3) Certified medical radiation technologist; or

(4) Certified nuclear medical technologist.

B. Health Occupations Article, §§ 14–404(b), 14–5A–
17(c), and 14–5B–14(c), Annotated Code of Maryland, gov-
erns mandatory actions of the suspension or revocation of a
license on the filing of certified docket entries, if the health
provider is convicted of or pleads guilty or nolo contendere
to a crime involving moral turpitude. . . .

■ It is well settled that "an administrative agency's inter-
pretation and application of the statute which the agency
administers should ordinarily be given considerable weight by
reviewing courts." *Banks*, 354 Md. at 69, 729 A.2d 376; *see
also Solomon v. Bd. of Physician Quality Assurance*, 132
Md.App. 447, 455, 752 A.2d 1217 (2000) (deciding to "accord
the Board's interpretation of the Maryland Medical Practice
Act considerable weight and deference"). "The same princi-
ples apply to an agency's interpretation of its own regulation."
*Smith v. State*, 140 Md.App. 445, 454–55, 780 A.2d 1199 (2001).

In light of these principles, we hold that the Board did not err in concluding that appellant was not entitled to a CRC; there is no statutory or regulatory provision requiring the Board to grant a CRC in a case arising under H.O. § 15–314(3).[6]

**JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**

---

6. In any event, under COMAR 10.32.02.03(C)(7)(b), the matter proceeds to a hearing when "there is no basis for an agreement...." Given the entrenched positions of the parties, we observe any error was harmless; even if a CRC had been granted, there was no basis to believe that any agreement as to discipline would have been reached.